# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DANIEL LITZ, | : | Case No. 3:18-cv-00215 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| COMMSSIONER OF SOCIAL SECURTY ADMINISTRATION, | : | |
| | : | |
| | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I.

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a disability, among other eligibility requirements. A disability in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Daniel Litz applied for Disability Insurance Benefits in July 2013, asserting that he was under a disability as of January 31, 2008. His application and evidence proceeded to a hearing before Administrative Law Judge (ALJ) Eric Anschuetz, who later concluded that Plaintiff was not under a disability and not eligible for benefits. Upon Plaintiff's appeal to this Court the parties agreed to a remand for further administrative proceedings.

On remand the Administration's Appeals Council vacated ALJ Anschuetz's decision

and sent to matter to an ALJ for further analysis. (Doc. #5, *PageID* #750-51). ALJ Mark Hockensmith then took up the matter. He held a hearing (during which Plaintiff testified) and later determined that Plaintiff was not under a disability and not eligible to receive benefits. *Id*. at 607-22, 682-712.

Plaintiff brings this case challenging ALJ Hockensmith's decision. He seeks a remand to the Social Security Administration for payment of disability insurance benefits or, alternatively, for further proceedings. The Commissioner seeks an Order affirming ALJ Hockensmith's non-disability decision.

## II.

Plaintiff was 40 years old and considered a younger person on the date (December 31, 2013) he was last insured under the Disability Insurance Benefits program. He has a high-school education, perhaps more. Before he applied for benefits, he worked as an automotive machinist.

Many years ago—at age 9—Plaintiff was diagnosed with Crohn's disease. *Id*. at 687. This chronic inflammatory disease of the intestinal tract most commonly manifests with symptoms of abdominal pain and diarrhea. Other symptoms include rectal bleeding, weight loss, fever, fatigue, anemia, joint pain, and nausea or loss of appetite. *See* https://medlineplus.gov/crohnsdisease.html; *see also* https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/symptoms-causes. Crohn's "disease is often accompanied by periods of inactivity as well as a high rate of recurrence after treatment." *Dix v. Sullivan*, 900 F.2d 135, 136 (8th Cir. 1990).

During ALJ Hockensmith's hearing, Plaintiff testified that since he was young, physicians had prescribed Prednisone. He explained, however, that his medications caused him to have a psychotic break in 2013. He could not take Prednisone after that. He reported, "And that was one of my key weapons to … help with the disease." *Id*. at 693.

The last company Plaintiff worked for went into bankruptcy in 2005. This caused him a lot of stress and aggravated his Crohn's disease. He explained to ALJ Hockensmith:

> So when I left the company, it had been very stressful, due to the bankruptcy process and I was—I had a hard time with it. And that probably caused some flare-ups … and those flare-ups would've been abdominal pain, bleeding, fatigue, those sorts of things. Just weakness, in general, bleeding, fatigue, those sorts of things. Just weakness, in general. Shakiness. And so—and then some of that time … was better. I would usually, like have bathrooms normally, three times a day and that would be okay, but, you know, like once a week, you know, I'll have diarrhea a couple of times and once a month, I'm sure to have a flare-up.

*Id*. at 694. Plaintiff testified that his flare-ups occurred "quite often during the years." *Id*. at 695. A flare-up could last up to months…, until they could get it under control. But usually, it's maybe three to five days…." *Id*. When he experiences a flare-up, he spends most of the day on the toilet. He gets a "really painful sensation" telling him he must use the bathroom. This would wear him out:

> I'd be sweating and tired and then I'd go [lie] on the bed and kind of curl up and put a hot water bottle on my stomach or something to—you know, take my medicine and try to ease the pain, but that's typically where I end up in … bed.

*Id*. at 696.

Plaintiff listed his medications at the time of the ALJ's hearing as Paroxetine ("for

3

mental health and anxiety"), Duloxetine ("for mental health and anxiety"), Buspar ("for mental health and anxiety"), Hydrazine ("for anxiety"), Omeprazole ("for acid reflux"), Amitryptiline ("for anxiety and it's a sleep aid"), Gabapentin ("for Crohn's and [his] nerves"), Hydrocodone ("for pain due to Crohn's"), Lorazepam ("for anxiety"), and Pentasa (for Crohn's). *Id*. at 696-97, 699-700.

Anxiety keeps Plaintiff homebound. He doesn't much like to be around people. He is anxious because he must frequently use the bathroom and does not like to go places where there's not a bathroom nearby he can sprint to. He does not like to eat out because eating causes him pain, requiring him to go home immediately. *Id*. at 697. He estimated that he spends about 80% of the time isolated from others. His health was starting to get really bad in 2009, and he was very anxious and had mental problems starting in 2010. He added, "I was having my normal Crohn's disease, but on top of that, in 2010 is when I was having a hard time mentally with the family and with myself." *Id*. at 698. During this time, he would feel very sad and depressed and would cry. Before 2010, he would go hiking. He considered himself an "outdoorsy person." *Id*. It was a huge change for him to spend a lot of time indoors. Sometimes Plaintiff needed to get to a bathroom within seconds. Once or twice a year he would not make it to the bathroom before he had an accident. *Id*. at 698-99.

Ann Litz, Plaintiff's wife of 21 years, testified during Plaintiff's first hearing (before ALJ Anschuetz) and during her second hearing (before ALJ Hockensmith). Ms. List told ALJ Hockensmith that Plaintiff had always been friendly in the past. She described him as a "talkative, easy-going person, [who] made friends easily, didn't have a problem

4

interacting with people, you know, neighbors, people walking down the street. He would talk to everybody. Very—just a very easy, gentle, kind person." *Id*. at 702. Ms. List said that Plaintiff liked to do a lot of outdoor activities such as hiking or coaching their kids' soccer teams. After he stopped working, he had "a lot of anxiety and stomach issues…. He was losing weight. He was just having a lot of stress issues. Mentally, he was struggling. [H]e was just sick a lot that last—the last year. I think we used up every hour of his FMLA that year…. And, you know, he just—he had a lot of pain and those types of things, so he was sick a lot that year." *Id*. at 702-03.

Ms. Litz testified that when Plaintiff had a really bad Crohn's flare-up, he curled up on the bed, sweating, and "you could just see he was in pain." *Id*. at 703. She confirmed that when they went out to eat (in years past), they always needed to be close to a restroom. *Id*. At one point, Plaintiff lost 33 pounds in 3 weeks. He needed to eat baby food to obtain calories. She explained, "since that's already like mushed and processed, it's easier to go through…." *Id*. at 704.

The ALJ asked Ms. Litz what things were like with Plaintiff during the 4 or 5 years after he stopped working. She revealed:

> [H]e is not anything like he used to be. He has major anxiety and panic attacks, which I think—well, I know for a fact that it was brought on by a psychotic break, due to his Prednisone. He had some anxiety and stuff before, but after that psychotic break from his Prednisone, he is not anything like he used to be, at all. Panic attacks. He doesn't really like to leave the bedroom. He doesn't have friends—doesn't talk with friends anymore.

*Id*. at 704-05. Ms. Litz also noticed problems with Plaintiff's memory. She explained, "we

5

can be driving somewhere and he will ask me six or seven times, where we're going. We'll be right in front of the building and he'll ask me where we're going…. I can tell him this is what we need to do. You need to go here and I have to do this and he will ask me five or six times, just about everything. It's like he can't remember everything." *Id*. at 705-06.

### III.

The administrative record contains documents and opinions from several medical professionals. In June 2013, state-agency physician Lynne Torello, M.D., reviewed the record and concluded that Plaintiff's "allegations are credible, as he obviously has a long history of Crohn's that causes discomfort. However, he has not had frequent ER visits or inpatient Hospitalizations that would be expected with a disabling bowel condition." (Doc. #5, *PageID* #124). Dr. Torello thought that Plaintiff could perform light work with no limitations. By way of explanation, Dr. Torello merely cited the "FOFAE" (Findings of Fact and Analysis of Evidence). *Id*. at 125.

Four months later, Eli Perencevich, M.D. examined the record and found that Plaintiff could perform light work with limitations to occasional climbing of ladders, ropes, or scaffold; frequent bending at the waist; frequent kneeling; and occasional crouching and crawling. Dr. Perencevich also thought that Plaintiff "should work near a bathroom facility." *Id*. at 138. Like Dr. Torello, Dr. Perencevich merely cited the FOFAE to explain her assessment of Plaintiff's residual functional capacity. *Id*.

In September 2013, psychologist Donald J. Kramer, Ph.D. examined Plaintiff at the request of the state agency. He diagnosed Plaintiff with depressive disorder and anxiety

6

disorder. He found Plaintiff to be a reliable informant—"open and honest in sharing information and his self-report was consistent with the clinical impression obtained in today's interview." *Id.* at 411-12. Dr. Kramer found Plaintiff's cognitive functioning to be "adequate in today's interview." *Id.* at 412. Dr. Kramer observed that Plaintiff's "attention, concentration, persistence and pace overall were adequate; although, [Plaintiff] did display some mild psychomotor retardation." *Id.* As to Plaintiff's limits in responding appropriately to supervision and coworkers, Dr. Kramer wrote:

> The claimant does come across as being somewhat anxious and depressed. He was rather tense, nervous, and ill at ease in today's examination. He describes himself as being socially anxious and avoidant and withdrawn because of his depression and anxiety. He seems to have little interaction even with his wife and says that he spends much of his time at home in his room by himself.

*Id.* Dr. Kramer further reported, "[Plaintiff] comes across as being depressed and lacking in energy, motivation, interest, and initiative. He also comes across as being anxious, tense, and nervous…. [He] also indicates that his main work limitations are due to his physical problems and that his increasing psychological difficulties are due to his worsening medical situation." *Id.* at 412-13.

A month later, psychologist Aracelis Rivera, Psy.D. reviewed the administrative record. She concluded that Plaintiff was moderately limited in many areas of social interactions—for example, his ability to interact appropriately with the general public and his ability to accept instructions and respond appropriately to criticism from supervisors. *Id.* at 139. She noted that during Dr. Kramer's examination, Plaintiff was anxious, tense, and

7

nervous. This led Dr. Rivera to conclude that Plaintiff can interact superficially with others. *Id*. Dr. Rivera also thought that from a mental-health standpoint, Plaintiff could adapt to a low-stress work setting where changes in routine are easily explained. *Id*. at 140.

In January 2015, Plaintiff's treating physician Raymond Luna, M.D., indicated that a biopsy confirmed that Plaintiff had inflammatory bowel disease. Dr. Luna reported that Plaintiff experienced chronic severe diarrhea, abdominal pain, and weight loss. Dr. Luna opined that from January 1, 2013, Plaintiff could work not any hours and had no ability to stand or lift during a workday. He further appeared to opine that Plaintiff could not engage in work activities during his flare-ups. *See id*. at 601. Dr. Luna believed that Plaintiff would be absent from work more than 3 times per month due to his gastrointestinal impairments or treatment.

In February 2015, treating digestive specialist Rajkamal Jit, M.D. reported that Plaintiff had chronic diarrhea and abdominal pain. Dr. Jit thought that Plaintiff would be absent from work approximately 2 days per month due to his gastrointestinal impairments or treatment. *Id.* at 580.

## IV.

Review of ALJ Hockensmith's decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

8

might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.).

ALJ Hockensmith reviewed the evidence and evaluated Plaintiff's disability status under each of the 5 sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. His more pertinent findings began at steps 2 and 3 where he found that Plaintiff had severe impairments—Crohn's disease, depression, and anxiety—and that his impairments did not automatically qualify him for benefits. (Doc. #5, *PageID* #610).

At step 4, the ALJ concluded that the most Plaintiff could do—his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—consists of light work with 11 limitations, including, "*ready access to restrooms*"; simple, routine tasks in a static work environment with few changes in routine and those changes easily explained; no fast paced work or strict production quotas; no direct dealing with the public; and occasional interaction with coworkers and supervisors. *Id.* at 612 (emphasis added).

The ALJ concluded at step 5 that there were about 200,000 jobs in the national economy Plaintiff could perform. *Id*. at 621-22. This led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive DIB.

**V.**

Plaintiff contends that the ALJ did not adequately or reasonably weigh the opinions provided by his treating medical sources, Drs. Jit and Luna. The Commissioner asserts that

9

the ALJ thoroughly considered these physicians' opinions and provided valid reasons, supported by substantial evidence, for placing little weight on their opinions.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at

*5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to subsequent reviewers the weight given and the reasons for that weight. *Id.*

The ALJ declined to place controlling weight on the opinions provided by Drs. Jit and Luna. The ALJ instead assigned "little weight" to their opinions. The ALJ first reasoned that "a significant gap in treatment with both providers during the relevant time period, from approximately December 2010 to January 2013." (Doc. #5, *PageID* #619). ALJ Hockensmith then found that the opinions of both treating physicians are "out of proportion with the objective signs and findings in the record…," and progress notes document only relative mild issues showing "improvement with treatment and eventual noncompliance." *Id*.

While ALJ Hockensmith summarily rejects the opinions of treating physicians Drs. Luna and Jit, he embraced the opinions of the state agency's non-examining consultants, Drs. Perencevich and Torello. He explained:

> I give significant weight to the opinions of the State agency reviewing physicians, as their assessments are generally supported by objective signs and findings in the preponderance of the record, including the records submitted after their assessments which address the time period at issue. Greater weight is given to Dr. Perencevich's assessment, as Dr. Torello did not include any postural limitations or access to a restroom, to account for Crohn's disease and abdominal pain.

*Id*. at 617.

The ALJ erred by not engaging in a properly balanced analysis when reviewing the opinions of Drs. Jit and Luna versus the opinions of Drs. Perencevich and Torello. "To be sure, a properly balanced analysis might allow the Commissioner to ultimately defer more to

11

the opinions of consultative doctors than to those of treating physicians. But the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed, they call for just the opposite." *Gayheart*, 710 F.3d at 379-80 (internal citation omitted). The ALJ also erred by diminishing the weight owed to the treating sources' opinions based on a gap in treatment but elsewhere uncritically assigning significant weight to the opinions of sources who never even saw the claimant once before rendering an opinion.

The ALJ further believed that the opinions of both treating physicians are "out of proportion with the objective signs and findings in the record." (Doc. #6, *PageID* #619). However, the ALJ's assessment Drs. Jit's and Luna's opinions contains no citations to "objective signs and findings" or any further explanation for this finding. This is problematic because without such information, it falls short of the good-reasons requirement. *See* 20 C.F.R. §404.1527(d)(2); *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *cf. Gayheart*, 710 F.3d at 377 ("For example, the conclusion that Dr. Onady's opinions 'are not well-supported by any objective findings' is ambiguous. One cannot determine whether the purported problem is that the opinions rely on findings that are not objective (i.e., that are not the result of medically acceptable clinical and laboratory diagnostic techniques…, or that the findings are

sufficiently objective but do not support the content of the opinions." (internal citation omitted)). Additionally, the ALJ's premise is incorrect as Plaintiff's objective testing has been consistently and significantly abnormal and has consistently documented his longstanding Crohn's disease. *See* Doc. #6, *PageID* #s 346-47, 371-75, 384-86, 406.

ALJ Hockensmith also attempts to contrast the opinions of Drs. Jit and Luna with comments regarding Plaintiff's Crohn's symptoms found in select treatment notes. These attempts are unavailing and ultimately unreasonable. For instance, ALJ Hockensmith cites a note from February 2010 as evidence that Plaintiff's symptoms were less severe than described by Drs. Jit and Luna. *Id*. at 619 (citing *id*. at 388). However, Plaintiff filed his application for benefits in 2013 and the treating sources rendered their opinions in 2015. *Id*. at 580-81, 601-02. This passage of time significantly undermines the ALJ's position, particularly considering that Plaintiff has specifically alleged a worsening of his condition over time.

ALJ Hockensmith next turns to an April 2013 treatment note and finds that the limitations assessed by Drs. Jit and Luna in 2015 were not credible because Plaintiff's diarrhea was described as "intermittent." *Id*. at 619 (citing *id*. at 369-70). ALJ Hockensmith's thinking here is dubious. Diarrhea is an inherently intermittent—rather than constant—symptom. More reasonably, Dr. Jit did not opine that Plaintiff's diarrhea would constantly impact his attendance at work, opting instead to opine that Plaintiff would experience intermittent absenteeism "about twice a month." *Id*. at 580-81. Dr. Luna similarly concluded that Plaintiff's absenteeism would occur "more than three times per

13

month" rather than constantly. *Id*. at 602.

Lastly, ALJ Hockensmith cites a note from May 2013 where Plaintiff reported improvement in his diarrhea and abdominal pain in response to treatment. *Id*. at 619 (citing *id*. at 394-96). However, such improvement—particularly with Crohn's disease—is relative and does not necessarily indicate the absence of a disabling condition. It is also noteworthy that, even per ALJ Hockensmith's own findings, any such improvement in May 2013 was temporary. This is seen in September 2013 when Plaintiff reported "increased abdominal pain." *Id*. at 619 (citing *id*. at 403-04). This is especially significant considering again that the opinions at issue were drafted in 2015. *See id*. at 580-81, 601-02.

Accordingly, Plaintiff's challenges to the ALJ's review of the opinions provided by Drs. Jit, Luna, Perencevich, and Torello are well taken.

## VI.

Plaintiff contends that ALJ Hockensmith's assessment of his residual functional capacity failed to adequately account for his Crohn's disease. He views the ALJ's finding that he could perform work with "ready access to restrooms" as an impermissibly vague accommodation for his Crohn's disease.

The ALJ's finding that Plaintiff's residual functional capacity included work that allowed "ready access to restrooms" without further exploration falls short of a reasonably specific finding. It is simply too vague as the ALJ used it here. *See Sherrill v. Comm'r of Soc. Sec.*, 1:13cv276, 2014 WL 1338114, at *7 (S.D. Ohio 2014) (Litkovitz, M.J.) (describing this work limitation as "vague") *Report & Recommendation adopted* 2014 WL

14

1672926 (S.D. Ohio 2014) (Barrett, D.J.). It fails to offer meaningful information about Plaintiff's work limitations and abilities. Ready access to a restroom implies that Plaintiff would be able to work a job as long as he could use the restroom anytime he needs to. Perhaps this would be reasonable if Plaintiff needed just one or two restroom breaks beyond the norm. But this conflicts with Plaintiff's experiences of Crohn's flare-ups. His reality is that he might well perform—and perform well—a job when his Crohn's symptoms are controlled. But, his symptoms of Crohn's, at least as he and Drs. Jit and Luna report them, fluctuate in severity and frequency such that he could not avoid excessive absenteeism and could not perform a work for 8 hours a day, 40 hours a week—even if given ready access to a restroom. The medical evidence, moreover, not only recounts Plaintiff's persistent Crohn's symptoms including multiple and urgent bowel movements per day and chronic abdominal pain, but also contains objective test results confirming his underlying Crohn's pathology.

Accordingly, Plaintiff's challenges to the ALJ's assessment of his work limitations caused by Crohn's disease are well taken.

## VII.

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at

545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is strong while contrary evidence is lacking. Plaintiff's testimony is consistent with the opinions provided by his long-term treating specialist Dr. Jit, his long-term treating physician Dr. Luna, his treatment records, and his objective test results. The vocational expert testified that there are no jobs available for a hypothetical person with the frequency of absenteeism Plaintiff must endure because of his severe, fluctuating, and intermittent Crohn's symptoms. He is consequently under a "disability" and eligible for Disability Insurance Benefits.

**IT IS THEREFORE ORDERED THAT**:

1.  The Commissioner's non-disability decision on April 23, 2018 is vacated;

2.  This matter is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits based on his application protectively filed on March 12, 2013; and

3.  The case is terminated on the Court's docket.


December 17, 2019 *s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge